IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
JUDGE WALKER D. MILLER

Civil Action No. 03-cv-01008-WDM-PAC

THOMAS J. CASSADY,

      Plaintiff,

v.

STEVEN E. GOERING *et al.*,

      Defendants.

_____

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
_____

Miller, J.

This matter is before me on defendants Steven Goering and Willis Boden's

(Defendants) Motion for Summary Judgment filed June 11, 2004.  I have considered

the parties' written arguments and their tendered evidence and have determined that

oral argument is not required.  For the reasons stated below, the motion will be

granted in part, and denied in part.

<u>Background</u>

Plaintiff Thomas J. Cassady (Cassady) brings this action, alleging his arrest

and a search of his property violated the Fourth Amendment and state law.  The facts

are as follows.

Cassady stored grain owned by Gary Queen (Queen) on Cassady's farm in Kit

Carson County, Colorado.  A dispute arose between the two regarding whether

Queen had paid Cassady for the storage.  According to Cassady, on the morning of

June 3, 2002, Cassady saw Queen's employee, Ken Dennis, leaving his property with a truck filled with grain.  When Dennis returned, Cassady and his son, Andrew, told Dennis to leave, and Cassady padlocked the grain bin.  Queen subsequently called Cassady, and Cassady told him to stay off Cassady's property until Queen paid his bill.  During lunch, Cassady saw Queen's truck arriving, and he told his son to call the police.  When he went out to the grain bin, Queen attacked him, leaving him unconscious.  However, Queen and Dennis called 911 and reported that Queen had been assaulted by Cassady after Queen had seen marijuana plants.  (Queen Dep., at 126-28.)

Meanwhile, defendant Steven Goering (Goering), sheriff of Kit Carson County, received a call from dispatch that Cassady wanted police help in getting Queen off his property.  While en route, at approximately 1 p.m., Goering received notice from dispatch about the alleged assault by Cassady, with "possible gun."  Defendant Willis E. Boden (Boden), a deputy sheriff with Kit Carson County, heard the call while at his desk, and responded to the intersection of County Road 58 and Road HH.

Goering arrived first at the intersection, finding Queen and Dennis there. Queen told Goering that Cassady had attacked him, but that Queen had escaped by using a wrestling move.  Queen also told Goering that his hand was hurt, leading Goering to infer that Queen had hit Cassady.  However, Queen did not have any injuries or other apparent sign of being assaulted.

Queen also told Goering that he had seen a lot of marijuana plants in a quonset hut, and that he had taken a plant from the hut and placed it in an electrical

2

box.  He also told Goering that he had a lease on the grain bins for storage of his grain on Cassady's property, and that Cassady had ordered he and Dennis off the property.

Dennis and Queen told Goering that Cassady's son and an unidentified woman were, or at least had been, on the property.  Queen told Goering that he had seen a handgun in Cassady's truck.  (Goering Dep., at 60.)  Using binoculars, Goering observed a truck driving around the farm.

Based solely on Queen's statement, Goering decided to arrest Cassady for assault, and he and three deputies, including Boden, drove to the farm to arrest Cassady.  When they arrived on the farm, Cassady was driving towards them in his truck.  Boden ordered Cassady out of the truck; the officers surrounded Cassady, ordered him onto the ground, handcuffed him, and leaned him against the tire of his truck.  Cassady was bleeding from the face and had a blackened eye.

The three deputies did a security sweep of the open areas and buildings, but found no one.  They also searched the truck but did not find any firearm.  They did not search the quonset hut.

Goering had the deputies bring Queen to the farm, where he wrote out a statement asserting that he had seen marijuana in the quonset hut.  Queen told Boden he knew what marijuana looked like because he had seen pictures of marijuana.

Goering told Boden to go back to the office and draft an affidavit for a warrant to search for illegal drugs and associated items, based upon Queen's statement.  After

3

Boden and the other deputies took Cassady to the hospital, Boden returned to the office and started drafting the affidavit. Boden requested assistance from Officer Jeff Annis (Annis) of the Burlington Police Department and Bob Beebe (Beebe), the "marijuana coordinator" for the Sheriff's office. Based on Annis' advice, Boden included computers, hydroponic lights, nutrients, fertilizers, timers, and records as items to be seized. Otherwise, Boden based the search warrant on Queen's statement, Cassady's driver's license,[1] and information from dispatch that Cassady had a prior arrest in 1992 for marijuana cultivation, as well as "form language" contained in a search warrant template.

Boden faxed the affidavit to a Logan County District Court Judge, who called Boden and asked him to swear over the phone that the information was true. The judge signed the search warrant and faxed it back to Boden at 6:38 p.m. The warrant authorized seizure of:

> Any & all narcotics, to wit; marijuana plants, and/or marijuana..., Any and all illegal contraband including, but not limited to; hydroponic grow lights & meters, watering systems, food, timers, containers, CO2 cylenders [sic], guages [sic] & testers, grow type mediums, exaust [sic] fans, fertalizer [sic], pruning equipment, any and all U.S. currency and/or

---

[1]Cassady disputes the fact that Boden looked at his driver's license, relying upon a finding by District Judge Marcia Krieger in a criminal matter related to these facts. However, Cassady may not rely upon collateral estoppel under these circumstances, because the individual defendants in this case were not parties, nor in privity with any of the parties, in the criminal case. *See Kinslow v. Ratzlaff*, 158 F.3d 1104, 1106 (10th Cir. 1998) (applying Oklahoma law); *Garza v. Henderson*, 779 F.2d 390, 393 (7th Cir. 1985); *Duncan v. Clements*, 744 F.2d 48, 52 (8th Cir. 1984); *Trujillo v. Simer*, 934 F. Supp. 1217, 1224 (D. Colo. 1996). Consequently, Boden's assertion that he did look at Cassady's license has not been directly disputed by competent evidence in accordance with Fed. R. Civ. P. 56(e).

financial instruments, precious metals, jewelery [sic], other items evidencing the obtaining, secreting, transfer and/or concealment of assets...records of transactions...computers, computer generated printouts, computer programs pertaining to financial transactions and/or computer discs where computer generated information pertaining to narcotic information storage for later recovery.  And all other evidence of criminal activity. [sic] and articles of personal property tending to establish the identity of the person or persons in control or possession of the place or vehicle, including but not limited to, utility company receipts, rent receipts, cancelled mail envelopes, vehicle registration, credit card receipts, repair bills, photographs, keys and articles of clothing, believed to situated at the place, in the vehicle or on that person known or described as:
Unincorporated Kit Carson County, State of Colorado; upon one or more of the grounds set forth in the Colorado Revised Statues and the Colorado Rules of Criminal Procedure, namely; that this property is stolen or embezzled; or is designed or intended for use as a means of committing a criminal offense; or is or has been used as a means of committing a criminal offense; of the possession of which is illegal; or would be material evidence...

(Mot. Summ. J., Ex. 32.)

Boden provided copies of the warrant to two drug task force officers who took the warrant to Goering, who was still at Cassady's farm.  The subsequent search uncovered a substantial and "sophisticated" marijuana growing operation, leading Goering to decide to turn the matter over to the Drug Enforcement Agency (DEA). Goering contacted DEA and arranged for the farm to be watched overnight.  He also allowed Queen to come onto the property and take his grain

DEA agents arrived at 10:00 a.m. the next day, and requested that the power to the Quonset hut be turned off.  Goering watched the DEA do their search, and left with them when they were done.

When Cassady returned home, the farm was a mess.  His house had been

5

ransacked, there was trash and his personal property on the floor, newly hatched chicks had been killed by being removed from their incubators, and most of his poultry was missing.  Additionally, coolers in the Quonset hut were destroyed, food in its freezers had rotted, and insulation had been torn out of its wall.

Cassady filed a complaint against Goering, Boden, the Town of Burlington (Burlington), Annis, and John Does 1 though 30, asserting the following eight claims: (1) violation of his Fourth Amendment rights under 42 U.S.C. § 1983; (2) trespass; (3) assault; (4) battery; (5) outrageous conduct; (6) abuse of process; (7) false arrest and imprisonment; and (8) civil conspiracy in violation of 42 U.S.C. § 1985.  On March 8, 2004, I took judicial notice of the stipulated dismissal of Annis and Burlington, and based on stipulated motion, ordered that the caption be amended to remove references to John Does 1-30.

## Standard of Review

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The nonmoving party must set forth facts showing that there is a genuine issue for trial.  The court views the record in the light most favorable to the party opposing the summary judgment motion.  *Cummings v. Norton* , 393 F.3d 1186, 1189 (10th Cir. 2005).  A factual issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

## Discussion

6

Defendants argue that Cassady's: (1) § 1983 claim be dismissed based on their qualified immunity; (2) § 1985 claim be dismissed because there is no evidence of a conspiracy; and (3) state law claims be dismissed under the Colorado Government Immunity Act.  I will discuss each in turn.

1.      § 1983 Claim

Cassady asserts that Defendants violated his rights under the Fourth Amendment by (1) arresting him without probable cause; (2) failing to provide medical assistance at the scene of the arrest; (3) applying for and obtaining, without probable cause, a warrant that was not sufficiently particular; (4) establishing a policy of obtaining unconstitutional search warrants; and (5) executing the search warrant without a good faith belief that it was lawful, and in a vicious and malicious manner. (Compl, ¶ 28.)  Defendants assert that they are protected from qualified immunity.

"In civil rights actions seeking damages from governmental officials, those officials may raise the affirmative defense of qualified immunity, which protects all but the plainly incompetent or those who knowingly violate the law." *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001).  When a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff to "first establish that the defendant's actions violated a constitutional or statutory right." *Medina v. Cram,* 252 F.3d 1124, 1128 (10th Cir. 2001).  Thus, in the context of a motion for summary judgment, I must first consider the threshold question: "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Holland*, 268 F.3d at 1185.  If so, then

7

I must "ask whether the right was clearly established at the time of defendant's unlawful conduct." *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (internal quotation omitted). If Cassady successfully establishes the violation of a clearly established right, the burden shifts to Defendants, who must prove that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. *Medina*, 252 F.3d at 1128. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002).

Defendants first argue that they are entitled to qualified immunity because Cassady's arrest was supported by probable cause. "A police officer violates an arrestee's clearly established Fourth Amendment right to be free of unreasonable seizure if the officer makes a warrantless arrest without probable cause." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002). I must grant Defendants qualified immunity if "a reasonable officer could have believed that probable cause existed to arrest the plaintiff." *Id.* (*quoting Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995)). *See also Hunter v. Bryant*, 502 U.S. 224, 227(1991) ("[e]ven law enforcement officials who reasonably but mistakenly conclude that probable cause is present" are entitled to immunity"). The Tenth Circuit requires that I analyze the question with reference only to the information Defendants had, and not the quality of their investigation. *See Olsen*, 312 F3d at 1312 (while factors regarding the scope of the arresting officer's investigation may be probative to the existence of probable cause, they are "not dispositive or indeed necessary to the inquiry. The primary

8

concern is whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer").

Probable cause exists "if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonable trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Id.* Probable cause may arise from a complaint by an identified victim of a crime. *See United States v. Patane*, 304 F.3d 1013, 1017 (10th Cir.), *rev'd on other grounds*, 542 U.S. 630 (2004). *See also Guzell v. Hiller*, 223 F.3d 518, 519-20 (7th Cir. 2000) ("[p]olice are entitled to base an arrest on a citizen complaint...of a victim...without investigating the truthfulness of the complaint, unless...they have reason to believe it's fishy").

The information Defendants had prior to arresting Cassady does not appear disputed, namely: (1) the Cassadys had called the Sheriff's office wanting Queen off of the property; (2) Queen and Dennis had subsequently called 911 claiming that Cassady had assaulted Queen; (3) Queen told Defendants that he was attacked by Cassady, and had used self-defense to extricate himself; (4) Queen did not appear to have any injuries or other indicia of being assaulted; and (5) Queen had stated there might be a firearm present.

However, Cassady argues that Defendants could not have reasonably relied upon Queen's statements because his "bias was clear and [his] motive was questionable." (Pl.'s Resp., at 21.)  Likewise, he notes that there was no evidence

corroborating Queen's statement, and certain facts made it suspect.  Namely, Queen

was of more formidable size than Cassady, and when Defendants ordered Cassady

out of his truck, they could see that, unlike Queen, he was bleeding from the mouth

and that he was "pretty beat up."  (Goering Dep., at 70, 74-75.)

First, there is no requirement that Queen's complaint be corroborated; rather,

victim witnesses are entitled a "presumption of veracity."  *See Patane*, 304 F.3d at

1017.  Consequently, the question becomes whether there were circumstances

sufficient to require that the Defendants treat Queen's complaint with special

skepticism.  *Id.  See also* 2 Wayne R. LaFave*, Search and Seizure* § 3.4(a), at 209-11

(3d ed. 1996) (noting that the prevailing view is that "when an average citizen tenders

information to the police, the police should be permitted to assume that they are

dealing with a credible person in the absence of special circumstances suggesting

that such may not be the case") (*quoted in Patane*, 304 F.3d at 1017).

Cassady asserts that Queen was "biased," which I interpret to mean that

Defendants should have suspected his complaint based on the fact that he and

Cassady were in a dispute.  However, on the record before me, the only knowledge

Defendants had regarding the dispute was that Cassady had ordered Queen off of

his property; this fact is not inconsistent with an allegation that Cassady had

subsequently tried to forcibly remove Queen.

More problematic is the fact that Cassady was clearly the loser in the

confrontation.  However, the fact that Cassady had suffered injuries was not

inconsistent with Queen's story of having to use self-defense against Cassady.

Further, although it would have been preferable for Defendants to obtain Cassady's side of the story prior to making the arrest, *Olsen* counsels that I am to analyze the Defendants' actions based "on the information possessed by the arresting officer." 312 F.3d at 1312. Consequently, I find that a reasonable officer could have believed that there was probable cause to arrest Cassady for assault, and Defendants are entitled to qualified immunity with regards to the arrest. *See id.*

Next, Defendants argue that they are entitled to qualified immunity with regards to the search warrant because they had probable cause for the issuance of the search warrant. Cassady responds that the search warrant was not supported by probable cause, and that in any event, it was not sufficiently particular.

The Fourth Amendment provides in part that "no Warrants shall issue, but upon probable cause." Defendants are entitled to qualified immunity if a reasonable officer could conclude that the search warrant issued by the state court was supported by probable cause. *See Jones v. City & County of Denver*, 854 F.2d 1206, 1209 (10th Cir. 1988). *See also Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (defendants are entitled to immunity if they establish that, in light of the clearly established principles governing Fourth Amendment searches, they could reasonably have believed that the search was lawful).

"The existence of probable cause is a common-sense standard requiring facts sufficient to warrant a man of reasonable caution in the belief that an offense has or is being committed." *United States v. Wicks*, 995 F.2d 964, 972 (10th Cir. 1993) (internal quotation omitted). Probable cause exists sufficient for issuance of a warrant when,

11

under the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Simpson*, 152 F.3d 1241, 1246 (10th Cir. 1998). *See also Breidenbach v. Bolish*, 126 F.3d 1288, 2393 (10th Cir. 1997) ("probable cause to obtain a search warrant is based on a showing of a reasonable degree of suspicion that the suspected items will be found")*, abrogated on other grounds*, *Currier v. Doran*, 242 F.3d 905, 916 (10th Cir. 2001).

Cassady suggests that Queen's credibility needed to be corroborated in some way before probable cause could exist.  However, "courts traditionally have distinguished between anonymous tipsters, whose motives and bases of knowledge are unknown to the investigating officers, and ordinary citizens who identify themselves and report crimes to the police."  *J.B. v. Washington County*, 127 F.3d 919, 929 (10th Cir. 1997).  Probable cause case law "emphasizes the importance of corroboration of some amount of the anonymous tipster's information...while presuming the reliability of citizen informants."  *Id.* at 929-930. *See also Patane*, 304 F.3d at 1017 (citizen complainants generally entitled a "presumption of veracity").

Here, Queen was an identified citizen witness entitled to a presumption of reliability.  Although Boden had never met Queen, Goering had known Queen since the late 1980s, as a member of the same community.  Goering was the officer who made the decision to seek a search warrant, and regardless, it is well established in this Circuit that "probable cause can rest upon the collective knowledge of the police, rather than solely on that of the" acting officer."  *United States v. Swingler,* 758 F.2d

12

477, 487 (10th Cir. 1985).  As discussed above, there were no special circumstances present which would have required a reasonable officer to treat Queen's report with skepticism.  Under these circumstances, where Defendants were informed by a known citizen witness that he had seen a large quantity of marijuana in the quonset hut, a reasonable officer could conclude that probable cause existed to support a search of Cassady's farm.

Cassady also asserts that the search violated his Fourth Amendment rights because the warrant was not sufficiently particular and overbroad.  The Fourth Amendment "requires that warrants particularly describe... the person or things to be seized."  *United States v. Leary*, 846 F.2d 592, 600 (10th Cir. 1988) (*quoting* U.S. Const. amend. IV).  This requirement prevents a "general exploratory rummaging in a person's belongings," *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).  "The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (*quoting Massachusetts v. Sheppard*, 468 U.S. 981, 988  (1984)).

"A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized."  *Leary*, 846 F.2d at 600.  Additionally, a search warrant may not be overbroad, but must authorize a search "confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause."  *United States v. Brown*, 984 F.2d 1074 1077 (10th Cir. 1993) (*quoting Voss v. Bergsgard*, 774 F.2d 402, 404 (10th

Cir. 1985)).  *See also Leary*, 846 F.2d at 605 ("a search warrant is also impermissibly overbroad if it authorizes the search and seizure of evidence that is not supported by probable cause").

The warrant in this case did not meet these requirements.  The search warrant is very broad in scope, authorizing the search of "the residence thereon, all outbuildings, enclosed livestock areas, garages, grain silos, storage buildings and the grounds surrounding these structures."  (Pl.'s Ex. A.)  Additionally, the warrant authorized the seizure of "Any & all narcotics," "Any and all illegal contraband," "Any and all U.S. currency and/or financial instruments, precious metals, jewelery [sic], other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money," "computers, computer generated printouts, computer programs pertaining to financial transactions," "articles of personal property tending to establish the identity of the person or person in control or possession of the place or vehicle, including but not limited to....photographs, keys and articles of clothing," and "all other evidence of criminal activity."  *Id.*

The existence of probable cause to search the quonset hut for marijuana does not by itself establish probable cause to search the entire farm and seize the variety of items listed in the warrant.  *See Leary*, 846 F.2d at 605 (the Fourth Amendment requires that"the scope of the warrant be limited to the specific areas and things for which there is probable cause to search").  Although in *United States v. Wicks*, 995 F.2d 964, 972 (10th Cir. 1993), the Tenth Circuit upheld a warrant cast in

14

comparatively broad terms in a drug trafficking case, the warrant was based in part on

DEA agents' sworn opinions, based on their experience, that such evidence would be

found at the site to be searched.  Here, there is no such affidavit, and in fact, Officer

Annis–from whom Boden sought advice while drafting his affidavit–testified that he

would not have included some of items, such as the precious metals and jewelry.[2]

More particularly, the warrant authorizes seizure of items that have no clear

relationship to a marijuana growing operation.  In addition to the jewelry and precious

metals, the warrant authorized the seizure of computers, computer generated

printouts, computer generated printouts, computer programs pertaining to financial

transactions, clothing, without making it reasonably clear that such items could only

be seized to the extent they related to a marijuana growing operation.  *See Leary*, 846

F.2d at 602 ("a proper warrant must allow the executing officers to distinguish

between items that may and may not be seized").  Most damningly, the warrant

authorized the seizure of "all other evidence of criminal activity."  *Cf. United States v.*

*Brown*, 984 F.2d 1074, 1077 (10th Cir. 1993) (finding warrant authorizing seizure of

items which executing officers reasonably believed to be stolen was overbroad);

*Leary*, 846 F.2d at 594 (finding warrant authorizing seizure of various items "relating to

the purchase, sale, and illegal exportation of materials in violation of the Arms Export

_____

[2]Defendants assert that Annis would testify that he had seen some of the items
included in the warrant, such as currency, jewelry, during searches of growing
operations.  However, because there is no evidence that, unlike his suggestion to
include items such as grow lights, fertilizer, etc., that he communicated this to Boden,
Annis' knowledge in this regard is irrelevant.

Control Act" was overbroad because the statute covered a broad range of activity and thus did not sufficiently limit the scope of the warrant).

Consequently, because of its lack of clarity and broad authorizations, the warrant "allowed precisely the kind of rummaging through a person's belongings, in search of even previously unsuspected crimes or of no crime at all, that the [F]ourth [A]mendment proscribes." *Voss*, 774 F.2d at 405. As such, the search was unconstitutional. Furthermore, based on the cases cited above, it is clear that the unconstitutionality of a search pursuant to a warrant that is overbroad and lacks particularity was clearly established in this Circuit at the time of the search. *See also Groh*, 540 U.S. at 564 ("[g]iven that the particularity requirement is set forth in the text of the Constitution, nor reasonable officer could believe that a warrant that plainly did no comply with that requirement was valid"). Consequently, I find that Defendants are not entitled to qualified immunity as to Cassady's allegations that the search warrant lacked particularity.[3]

Defendants also fail to address Cassady's allegations that his Fourth Amendment rights were violated by their execution of the search warrant, or by a policy of obtaining unconstitutional search warrants. *See, e.g., Lawmaster v. Ward*, 125 F.3d 1341, 151 (10th Cir. 1997). Consequently, Defendants have not established that they

---

[3]Defendants also note that an overbroad warrant may be "severed." *Brown*, 984 F.2d at 1078. While this is true in criminal proceedings, allowing only those items confiscated under the overbroad portion of the warrant to be suppressed, Defendants provide no authority that this doctrine may be somehow applied in the context of a § 1983 action. *See id.*

are entitled to qualified immunity with regards to these allegations either.

  2. § 1985 Claim

  Defendants argue that Cassady's § 1985 claim must be dismissed because there is no evidence of an agreement amongst them to deprive him of his rights. Cassady responds in one sentence that the referenced facts are sufficient to give rise to an agreement between Defendants and Queen to violate Cassady's Fourth Amendment rights.

  The essential elements of a § 1985(3) claim are: (1) a conspiracy; (2) to deprive plaintiff of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting therefrom. *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993). *See also Babbar v. Ebadi* , 216 F.3d 1086, 2000 WL 702428, at **8 (10th Cir. May 26, 2000) (unpublished table decision) (to survive a motion for summary judgment as to § 1985 claim, plaintif "must furnish a genuine factual basis to support the existence of the defining elements of a conspiracy--agreement and concerted action.") Cassady has pointed to no evidence that demonstrates any factual basis for an agreement between Defendants or a meeting of their minds. *See id.* Consequently, this claim will be dismissed.

  3. State Law Claims

  Defendants argue that they are immune from Cassady's state law claims under the Colorado Governmental Immunity Act (CGIA), Colo. Rev. Stat. § 24-10-101, *et seq.* because they did not act "willfully and wantonly."

The CGIA generally provides that public employees shall be immune from liability in any claim for injury "which lies in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by a claimant and which arises out of an act or omission of such employee occurring during the performance of his duties and within the scope of his employment unless the act or omission causing such injury was willful and wanton."  Colo. Rev. Stat. § 24-10-118(2)(a).  *See also Jarvis v. Deyoe*, 892 P.2d 398, 401 (Colo. Ct. App. 1994) ("public entities and public employees acting within the scope of their employment are immune from any tort claim that does not fall within one of the six limited areas for which immunity has been waived or unless the act or omission causing the injury was willful and wanton").

Defendants first assert that willful and wanton conduct must involve "an element of conscious disregard for the <u>safety</u> of others," and most of his state claims do not revolve around a threat to Cassady's safety.  *See id.* at 401 (emphasis added).  Colorado courts have not interpreted the phrase so narrowly.  *See King v. United States*,  53 F. Supp. 2d 1056, 1073 (D.Colo.), *rev'd in part*, 301 F.3d 1270 (10th Cir. 2002) (Colorado courts to have defined willful and wanton conduct as "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to the consequences, or the rights and safety of others, particularly the plaintiff[s]"); *Robinson v. City & County of Denver*, 39 F. Supp. 2d 1257, 1264 (D. Colo. 1999) (officers who brought media with them into plaintiff's home acted willfully and wantonly when executing search warrant).  *See*

18

*also Bresciani v. Haragan,* 968 P.2d 153, 159-60 (officers conduct causing excessive and unnecessary damages to premises while executing a search warrant may have been willful and wanton); *Barhan v. Scalia*, 928 P.2d 1381, 1386 (Colo. Ct. App. 1996) (claim of interference with employment contract could involve willful and wanton conduct); *Holland v. Bd of County Com'rs*, 883 P.2d 500, 509 (Colo. Ct. App. 1994) (allegation that defendant provided false and defamatory information causing employer to terminate plaintiff alleged wanton and willful conduct). I agree with these courts that willful and wanton conduct may include purposeful conduct committed with reckless disregard of a plaintiff's rights.

However, I do agree with Defendants that, to the extent his state law claims rely on the same conduct for which they have established entitlement to qualified immunity, they did not act willfully and wantonly. *See Trujillo*, 934 F. Supp. at 1225-26 (reasoning that a finding of qualified immunity on Fourth Amendment claim also established absence of willful and wanton conduct); *Hall v. Lopez*, 823 F. Supp. 857, 866 (D. Colo. 1993) (noting it would make no sense to hold officers liable under state tort claims for same conduct for which they were protected for by qualified immunity on federal claim). Consequently, Cassady's third claim (assault) fourth claim (battery), and seventh claim (false arrest), which all rely on the absence of probable cause for his arrest, must be dismissed under the CGIA.

However, this argument fails with regards to Cassady's second claim (trespass), fifth claim (outrageous conduct), and sixth claim (abuse of process), because these claims rely on allegations that the warrant was facially invalid and that

19

Defendants acted maliciously in executing the search, conduct for which I have not determined Defendants are entitled to qualified immunity. Consequently, these claims remain pending.[4]

Accordingly, it is ordered that :

1.    Defendants' motion for summary judgment, filed June 16, 2005 (Docket # 74) is granted in part and denied in part.

2.    Plaintiff's first claim for relief, alleging violations of 42 U.S.C. § 1983, is dismissed with prejudice to the extent it relies on allegations that Cassady's arrest and the warrant authorizing a search of his property were not supported by probable cause. Otherwise the claim remains pending.

3.    Plaintiff's third, fourth, seventh, and eighth claims are dismissed with prejudice.

4.    This case remains pending on Plaintiff's first claim as limited above, as well as his second, fifth and sixth claims.

DATED at Denver, Colorado, on July 21, 2005.

BY THE COURT:


/s/ Walker D. Miller
United States District Judge

---

[4]Cassady also argues that Colo. Rev. Stat. § 29-5-111 somehow waives Defendants' immunity. This statute, which creates local government obligations to indemnify peace officers under certain circumstances, is inapplicable.